# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

MICHAEL J. NASSER, SR.

     **Plaintiff,**

**v.**                                **Civil Action No.: 5:12cv097**

**WHITEPAGES, INC.**

     **Defendant.**

---

## WHITEPAGES, INC.'S MOTION FOR SUMMARY JUDGMENT

Defendant WhitePages, Inc., by counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves this Court for summary judgment on all claims set forth in Plaintiff Michael J. Nasser, Sr.'s Complaint.

WhitePages moves for summary judgment because no genuine disputes or issues of material fact exist. The specific grounds for this Motion are more fully set forth in the following Memorandum in Support of WhitePages, Inc.'s Motion for Summary Judgment.

DATED: August 15, 2013

                                       */s/ Timothy J. Battle*

                                       Timothy J. Battle, Esq. (VSB #18538)

                                       524 King Street

                                       Alexandria, Virginia 22314

                                       Tel: (703) 836-1216

                                       Fax: (703) 549-3335

/s/ Sean M. McChesney

Sean McChesney (admitted *pro hac vice*)

/s/Venkat Balasubramani

Venkat Balasubramani (admitted *pro hac vice*)

Focal PLLC

800 Fifth Avenue, Suite 4100

Seattle, Washington 98104

Tel: (206) 617-3040

Fax: (206) 260-3966

Email: sean@focallaw.com

Email: venkat@focallaw.com

*Counsel for WhitePages, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | |
|---|---|
| **MICHAEL J. NASSER, SR.** | |
|     **Plaintiff,** | |
| **v.** | **Civil Action No.: 5:12cv097** |
| **WHITEPAGES, INC.** | |
|     **Defendant.** | |

## WHITEPAGES, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................1

II.     RELEVANT FACTS ...........................................................................2

     A.     WhitePages Websites ................................................................2

     B.     WhitePages' Co-Brand Partners ...............................................3

     C.     Sources of WhitePages Listings Generally ................................3

     D.     The Relationship of the Parties ...............................................4

     E.     Sources of the Listings in Dispute ...........................................4

III.    DISCUSSION .....................................................................................6

     A.     Summary Judgment Standard ..................................................6

     B.     Basic Negligence and First Amendment Principles Preclude Imposing a Duty on WhitePages to Verify or Correct Listing Information ...........................7

          1.     Courts decline to impose duties on both online and off-line publishers ......7

          2.     First Amendment concerns counsel against the imposition of liability .......9

     C.     Section 230 of the Communications Decency Act Bars Nasser's Claims Against WhitePages ...........................................11

          1.     WhitePages qualifies for Section 230 immunity .......................12

               a.     WhitePages Provides an Interactive Computer Service ...............12

               b.     The Relevant Listings Were Provided by Third-Parties ...............13

               c.     Nasser Seeks to Treat WhitePages as the Publisher of the Listings ................................................14

          2.     WhitePages did not sell any listings to Yellowbook directories ............16

          3.     Nasser cannot make out a claim under Barnes v. Yahoo! .........................17

          4.     Section 230 does not impose a duty to monitor or remove listings ...........18

          5.     Section 230 bars all of Nasser's claims ..................................19

IV.    CONCLUSION .................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

Anderson v. Liberty Lobby, Inc.,
 477 U.S. 242 (1986) ........................................................................................................ 6

Barnes v. Yahoo!, Inc.,
 570 F.3d 1096 (9th Cir. 2009) .......................................................................... 15, 17, 18

Batzel v. Smith,
 333 F.3d 1018 (9th Cir. 2003) ....................................................................................... 13

Black v. Google Inc.,
 No. 10-02381 CW, 2010 U.S. Dist. LEXIS 82905 (N.D. Cal. Aug. 13, 2010) .......................... 19

Blumenthal v. Drudge,
 992 F. Supp. 44 (D.D.C. 1998) ............................................................................... 12, 18

Brandt v. Weather Channel, Inc.,
 42 F. Supp. 2d 1344 (S.D. Fl. 1999) .............................................................................. 10

Braun v. Soldier of Fortune Magazine, Inc.,
 968 F.2d 1110 (11th Cir. 1992) ..................................................................................... 10

Celotex Corp. v. Catrett,
 477 U.S. 317 (U.S. 1986) ............................................................................................ 6, 7

Cormier v. Atl. Law Group,
 2012 U.S. Dist. LEXIS 110885 (E.D. Va. Aug. 7, 2012) ............................................... 18

Cunningham v. Delhaize America, Inc.,
 No. 3:12cv00004, 2012 U.S. Dist. LEXIS 140655 (W.D. Va. September 27, 2012) ................ 18

Dart v. Craigslist,
 665 F. Supp. 2d 961 (N.D. Ill. 2009) ............................................................................ 19

Demuth Dev. Corp. v. Merck & Co.,
 432 F. Supp. 990 (E.D.N.Y. 1977) .................................................................................. 8

Dex Media West, Inc. v. City of Seattle,
 696 F.3d 952 (9th Cir. 2012) ........................................................................................... 9

Dimeo v. Max,
 433 F. Supp. 2d 523 (E.D. Pa. 2006) ............................................................................. 20

Doe v. MySpace, Inc.,
 474 F. Supp. 2d 843 (W.D. Tex. 2007) .......................................................................... 19

Donato v. Moldow,
 374 N.J. Super. 475 (App. Div. 2005) ........................................................................... 19

Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,
  521 F.3d 1157 (9th Cir. 2008) ...................................................................... 12, 13, 16

First Equity Corp. v. Standard & Poor's Corp.,
  670 F. Supp. 115 (S.D.N.Y. 1987)........................................................................ 8

Gavra v. Google Inc.,
  Case No.: 5:12-CV-06547-PSG, 2013 U.S. Dist. LEXIS 100127 (N.D. Cal. July 17, 2013).... 15

Gertz v. Robert Welch, Inc.
  418 U.S. 323 (1974)............................................................................................ 10

Gutter v. Dow Jones, Inc.,
  490 N.E.2d 898 (S. Ct. Ohio 1986)...................................................................... 8

Hare v. Richie,
  No. ELH-11-3488, 2012 U.S. Dist. LEXIS 122893 (D. Md. Aug. 29, 2012) ........................... 12

Jones v. J. B. Lippincott Co.,
  694 F. Supp. 1216 (D. Md. 1988) ........................................................................ 8

Levitt v. Yelp! Inc.,
  No. C 10-1321 MHP, 2011 U.S. Dist. LEXIS 99372 (N.D. Cal. Mar. 22, 2011) ...................... 12

Mongold v. Woods,
  278 Va. 196 (Va. 2009)........................................................................................ 18

Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,
  591 F.3d 250 (4th Cir. 2009) ...................................................................... 7, 11, 13, 17

Noah v. AOL Time Warner, Inc.,
  261 F. Supp. 2d 532 (E.D. Va. 2003) .................................................................... 20

Pittman v. Dow Jones & Co.,
  662 F. Supp. 921 (E.D. La. 1987).......................................................................... 8

Ramey v. Darkside Prods.,
  No. 02-730 (GK), 2004 U.S. Dist. LEXIS 10107 (D.D.C. May 17, 2004) ............................... 19

Rosenberg v. Harwood,
  No. 100916536 (Utah Third Judicial District Court May 27, 2011) ........................................ 9

Smith v. Linn,
  563 A.2d 123 (Pa. Super. Ct. 1989)........................................................................ 10

Universal Commc'ns Sys., Inc. v. Lycos, Inc.,
  478 F.3d 413 (1st Cir. 2007).................................................................................. 13

Winter v. G.P. Putnam's Sons,
  938 F.2d 1033 (9th Cir. 1991) .............................................................................. 8, 11

Zeran v. America Online, Inc.,
  129 F.3d 327, 330 (4th Cir. 1997) ...................................................................... 11, 19

**Statutes**

47 U.S.C. § 230(c)(1)...................................................................................................... 11

47 U.S.C. § 230(e)(3)...................................................................................................... 11

47 U.S.C. § 230(f)(2) ................................................................................................ 11, 13

**Rules**

Federal Rule of Civil Procedure 56(c) ........................................................................... 6

## I.    <u>INTRODUCTION</u>

In this action, plaintiff Michael J. Nasser, Sr. ("Nasser") alleges that defendant WhitePages, Inc. ("WhitePages"), a provider of online directory websites, published listings on its websites that incorrectly associated Nasser's address and telephone number with "Comcast Phone of Virginia" and "Comcast Phont of Virginia," resulting in Nasser receiving a flood of unwanted phone calls intended for Comcast.  Nasser alleges that these unwanted calls required him to seek medical treatment for various ailments.  Nasser seeks an award of $745,000 in compensatory and punitive damages under Virginia law for intentional infliction of emotional distress, negligent infliction of emotional distress, and nuisance.

As an initial matter, WhitePages, as a publisher and an arms-length stranger to Nasser without any contractual or fiduciary relationship, owes no duty to Nasser pursuant to which tort claims may be premised.  Additionally, strong First Amendment concerns preclude the imposition of liability on WhitePages.

Furthermore, WhitePages did not create the listings in question.  Rather, WhitePages obtained the listings from third-party data providers and merely published the listings on WhitePages' websites.  Section 230 of the Communications Decency Act provides broad immunity to online intermediaries, such as WhitePages, from causes of action based on the publication of information that originated with third-parties.  As a result of Section 230's protections, WhitePages is immune from the claims asserted by Nasser.  The Court granted limited discovery to Nasser around the issue of whether WhitePages created any of the listings in question.  (Memorandum Opinion (Dkt. No. 32); Order (Dkt. No. 33).)  Nasser's speculative allegations aside, the evidence unequivocally shows that <u>all</u> of the listings originated with third parties.  Accordingly, WhitePages respectfully requests that the Court dismiss Nasser's

Complaint, in its entirety, and with prejudice.

## II.     RELEVANT FACTS

**A.     WhitePages Websites**

WhitePages is a provider of online directory websites, including its primary website located at www.whitepages.com (the "WhitePages.com Site"), as well as the website located at 411.com (the "411.com Site") (the WhitePages.com Site and the 411.com Site are referred to herein collectively as the "WhitePages Websites"). (Declaration of Joel Azose in Support of Defendant WhitePages, Inc.'s Motion for Summary Judgment ("Azose Decl.") at ¶ 4.)

Users of the WhitePages Websites can conduct various types of searches in order to obtain contact information for people and businesses. (Id. at ¶ 5.) For example, a user can conduct a "people search" by typing in a person's name in order to find addresses and telephone numbers associated with that person. (Id.) Similarly, a user can conduct a "business search" by entering the name of a business in order to obtain addresses and telephone numbers associated with that business. (Id.) The WhitePages Websites also allow a user to conduct a "reverse phone search," whereby the user types in a telephone number in order to find the names of persons and/or businesses associated with that telephone number. (Id.) Nasser himself has engaged in these activities on the WhitePages Websites. (Plaintiff's Responses to WhitePages, Inc.'s First Set of Requests for Admissions (attached as Exhibit "B" to the Declaration of Sean M. McChesney in Support of WhitePages' Motion for Summary Judgment ("McChesney Decl.")), Resp. Nos. 7-10.)

The WhitePages Websites also allow users to take other actions with respect to listings, such as forwarding the listing to a mobile phone, obtaining directions to or from an address contained in the listing, and saving the listing to an account (if the user has created an account).

2

(Id. at ¶ 6.)  Additionally, the WhitePages Websites provide users online methods for removing or editing their listings, and for suggesting the removal of, or corrections to, listings belonging to others.  (Id.)  All of these services are offered at no cost to end users.  (Id.)

WhitePages does not sell or otherwise provide listings to persons or entities that publish traditional printed telephone directories.  (Azose Decl. at ¶ 14.)

**B.      WhitePages' Co-Brand Partnerships**

In addition to operating its own directories, WhitePages sometimes handles the search and result process on behalf of other online directory websites ("Co-Brand Partners").   (Azose Decl. at ¶ 7.)  In those circumstances, when a user enters a search query on a Co-Brand Partner's website, that query is actually directed to WhitePages, and WhitePages then displays a result page directly from WhitePages' computer servers.  (Id.)

Nasser has alleged that WhitePages owned the DirectoryAssistance.com Site. (Complaint (Dkt. No. 5-1) at ¶ 30.)   But in fact, WhitePages has never owned the DirectoryAssistance.com Site.  (Azose Decl. at ¶ 8; see also historical WHOIS report for directoryassistance.com, attached as Exhibit "A" to the McChesney Decl., demonstrating ownership of the directoryassistance.com site by Neil Gorin since 2001.)   Rather, the DirectoryAssistance.com Site was merely a Co-Brand Partner.  (Azose Decl. at ¶ 8.)

**C.      Sources of WhitePages Listings Generally**

WhitePages does not generate any listings of its own—*i.e.*, it is not a source of any data displayed or otherwise utilized by WhitePages in providing listings.  (Azose Decl. at ¶ 9.) WhitePages obtains listings from a variety of third-party sources, including users of its websites, public records databases, telephone companies, and commercial entities that compile name, address and phone number data from the foregoing sources and other sources.  (Id.)  WhitePages

enters into licensing agreements with third-party data providers pursuant to which the data providers periodically (typically monthly or quarterly) provide new listings to WhitePages.  (Id.) The listings are stored in WhitePages' databases (or in some cases, the databases of its data providers) and then retrieved in response to search queries by users.  (Id.)  If there are matching listings, those listings will be displayed to the user.  (Id.)  The listings that WhitePages makes available are not vetted for accuracy by WhitePages.  (Id.)  In other words, WhitePages does not make a determination as to whether the information in such listings is accurate prior to making them available for search results.  (Id.)  It simply provides the listing information it receives from its third-party sources.  (Id.)

**D.      The Relationship of the Parties**

WhitePages and Nasser are arms length strangers, having no contractual, fiduciary or any type of special relationship.  Prior to the instigation of litigation, other than the sole telephone call between Nasser and a WhitePages customer service representative on October 28, 2009, Nasser never contacted WhitePages by any means.  (Plaintiff's Responses to WhitePages, Inc.'s First Set of Requests for Admissions (attached as Exhibit "B" to the '"McChesney Decl."), Resp. No. 18.)  Nasser was never a paying customer of WhitePages, (id., Resp. No. 13), nor did Nasser ever create an account with WhitePages.  (Id., Resp. No. 17.)  WhitePages never solicited Nasser by any means, (id., Resp. No. 16), nor did the parties enter into any agreements. (Id., Resp. Nos. 14, 15.)

**E.      Sources of the Listings in Dispute**

The listings relevant to this action (i.e., those that allegedly resulted in the unwanted phone calls and prompted Nasser's to contact WhitePages in October 2009) are listings that associated Nasser's address and telephone number with "Comcast."  (Complaint (Dkt. No. 5-1)

at ¶ 2, 8.)

Nasser previously brought a lawsuit against Verizon Virginia, Inc. and WhitePages in the Circuit Court for the County of Frederick, Virginia ("*Nasser I*"). In that action, the court determined that the original association of "Comcast" with Nasser's address and telephone number was the result of an error by a Verizon employee in processing the listing after Verizon had received the listing from Comcast, Mr. Nasser's telephone company. (Order Granting in Part Verizon's Plea in Bar (Dkt. No. 11-2), pp. 1-2.) Verizon thereafter "distributed that incorrect listing to a number of telephone directories." (Id.) Nasser does not dispute these facts. (Plaintiff's Response to WhitePages, Inc.'s First Set of Requests for Admissions (attached as Exhibit "B" to the McChesney Decl.), Resp. No. 2.)

Nasser's complaint contains two exhibits from WhitePages Websites that show listings associating Nasser's address and telephone number with "Comcast, Phone of Virginia." (Complaint, Exs. "N" (Dkt. No. 5-2, p. 26) and "S" (Dkt. No. 5-2, p. 35) (exhibits "N" and "S" appear to be duplicates of each other).) The Complaint contains five exhibits from WhitePages Websites which show listings associating Nasser's address and telephone number with "Comcast Phont of Virginia." (Complaint, Exs. "E" (Dkt. No. 5-2, p. 13), "T" (Dkt. No. 5-2, p. 37), "U" (Dkt. No. 5-2, p. 38), "V" (Dkt. No. 5-2, p. 39) and "W" (Dkt. No. 5-2, p. 40).) All of these listings were obtained by WhitePages from third parties. (Azose Decl., ¶¶ 15-17.)

WhitePages provides evidence that it obtained a listing associating Nasser's address and telephone number with "Comcast, Phone of Virginia" from a third-party data provider in March 2010. (Azose Decl. at ¶ 16.) This listing is the source of the search results displayed in Exhibits N and S of Nasser's complaint. (Id.) In contrast, in response to discovery requests, Nasser failed to produce any evidence that WhitePages created or developed any part of any "Comcast Phone

Listings." (Plaintiff's Responses to WhitePages, Inc.'s First Set of Interrogatories and Requests for Production of Documents and Things (attached as Exhibit "C" to the McChesney Decl.), pp. 4, 6 and 7.) Similarly, WhitePages provides evidence that it obtained a listing associating Nasser's address and telephone number with "Comcast Phont of Virginia" in February 2010 from Amacai Information Corp. d/b/a Localeze. (Azose Decl. at ¶ 17.) This listing is the source of the search results displayed in Exhibits E, T, U, V and W of Nasser's complaint. (Id.) But again, in response to discovery requests, Nasser failed to produce any evidence that WhitePages created or developed any part of any "Comcast Phont Listings." (Plaintiff's Responses to WhitePages, Inc.'s First Set of Interrogatories and Requests for Production of Documents and Things (attached as Exhibit "C" to the McChesney Decl.), pp. 5, 6 and 8.)

### III.    DISCUSSION

**A.    Summary Judgment Standard**

Pursuant to Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (U.S. 1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. Celotex Corp., 477 U.S. at 325. The opposing

party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials.  Anderson, 477 U.S. at 248.  A mere scintilla of evidence supporting the case is insufficient.  Id.

The summary judgment standards applicable in a typical case are modified here due to application of 47 U.S.C. section 230, which (as discussed on page 10, infra) provides for robust immunity from claims based on content supplied by third parties.  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 254-55 (4th Cir. 2009) ("[I]mmunity is an immunity from suit rather than a mere defense to liability and it is effectively lost if a case is erroneously permitted to go to trial.")  The nature of Section 230 immunity counsels that courts resolve Section 230 defenses at the earliest possible stage, so that intermediaries are not effectively deprived of Section 230's protection by having to expend the resources for defending against claims for which they are entitled to immunity.  As explained in Nemet Chevrolet:

> Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process. As we have often explained in the qualified immunity context, "immunity is an immunity from suit rather than a mere defense to liability" and "it is effectively lost if a case is erroneously permitted to go to trial."  Brown v. Gilmore, 278 F.3d 362, 366 n.2 (4th Cir. 2002) (quotations omitted) (emphasis in original). We thus aim to resolve the question of §230 immunity at the earliest possible stage of the case because that immunity protects websites not only from "ultimate liability," but also from "having to fight costly and protracted legal battles."  Room-mates.com, 521 F.3d at 1175.

Nemet Chevrolet, 591 F.3d 250 (4th Cir. 2009) at 254-255.

**B.     Basic Negligence and First Amendment Principles Preclude Imposing a Duty on WhitePages to Verify or Correct Listing Information**

1.      Courts decline to impose duties on both online and off-line publishers.

Nasser's claims fail as a matter law because WhitePages owed no duty to Nasser.  As Judge Prosser noted in *Nasser I*, as a general rule, a company that lists incorrect information in a

directory can be held liable to one of its customers, but does not "owe[] a duty to members of the public, who are not its subscribers or who have not paid to have their number listed, to correctly list their telephone numbers."  (Order Granting in Part Verizon's Plea in Bar (Dkt. No. 11-2), p. 2.)  As Mr. Nasser admits, he had no relationship, contractual or otherwise with WhitePages. (Plaintiff's Response to WhitePages, Inc.'s First Set of Requests for Admissions (attached as Exhibit "B" to the McChesney Decl.), Response Nos. 13-18.)  Accordingly, WhitePages does not owe Mr. Nasser a duty, and his claims—which all depend on the existence of some sort of duty—fail as a matter law.

Moreover, courts have uniformly refused to find that publishers (whether traditional or electronic) owe a duty to the general public to provide accurate information, noting that among other reasons, such a duty (and the prospect of unlimited liability flowing from it) would impede the free-flow of information. See, e.g., First Equity Corp. v. Standard & Poor's Corp., 670 F. Supp. 115, 117 (S.D.N.Y. 1987) (declining to impose a duty on a publisher because "the potential number of persons to whom a publication might become available is without limit"); Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1037 (9th Cir. 1991) ("defendants have no duty to investigate the accuracy of the contents of the books it publishes"); Jones v. J. B. Lippincott Co., 694 F. Supp. 1216, 1216-17 (D. Md. 1988) (publisher not liable to nursing student injured in treating self with remedy described in nursing textbook); Gutter v. Dow Jones, Inc., 490 N.E.2d 898, 902 (S. Ct. Ohio 1986) (Wall Street Journal not liable for inaccurate description of certain corporate bonds); Demuth Dev. Corp. v. Merck & Co., 432 F. Supp. 990, 993 (E.D.N.Y. 1977) (stating that imposing a duty would allow unlimited claims, which could be "devastating in number" (internal quotation marks omitted)); Pittman v. Dow Jones & Co., 662 F. Supp. 921, 922 (E.D. La. 1987) ("courts have placed more value on the societal benefits of

information availability than on the rights of private persons who claim to have been harmed").

The court's decision in Rosenberg v. Harwood is particularly relevant in this regard. *See* Rosenberg v. Harwood, Case No. 100916536 (Utah Third Judicial District Court May 27, 2011) (attached as Exhibit "D" to the McChesney Decl.). In Rosenberg, a plaintiff sought to hold Google liable for the negligent provision of walking directions via Google's online "Google Maps" service, which allegedly caused the plaintiff to suffer injuries while walking. Rosenberg, p. 1. The court canvassed various decisions and concluded that a general duty of accuracy could not be imposed on Google. Rosenberg, p. 9. In doing so, the court focused on the high social utility of Google's map services and the attenuated relationship between plaintiff and Google:

> [T]he relationship between Google was somewhat attenuated and there was no special, fiduciary, or contractual relationship between the parties that would give rise to a duty of protection. Finally, and perhaps most significantly, policy considerations weigh strongly against imposing the suggested duties on Google because the heavy burdens associated with such a duty, along with the high value of Google's services, significantly outweigh the minimal likelihood of injury.

Those considerations apply with equal force to the instant case where WhitePages offers a free directory service that unquestionably has high social utility. Imposing a duty on WhitePages and other similarly situated service providers is simply not in the public interest. Additionally, as set forth below, the imposition of liability on WhitePages based on the publication of inaccurate contact information implicates serious First Amendment concerns.

2. First Amendment concerns counsel against the imposition of liability.

As court decisions recognize, telephone directories (even yellow pages directories) are entitled to First Amendment protection. Dex Media West, Inc. v. City of Seattle, 696 F.3d 952, 965 (9th Cir. 2012) (concluding that "yellow pages directories are entitled to full First Amendment protection"). Given that WhitePages' directories are fully protected speech, the imposition of liability on WhitePages should conform to First Amendment restrictions.

9

The Supreme Court's decision in Gertz v. Robert Welch, Inc. set forth a constitutionally acceptable standard for imposing liability on publishers, holding that a state could impose liability on a publisher who negligently printed a defamatory statement only when the substance of the statement made "substantial danger to reputation *apparent.*" Gertz v. Robert Welch, Inc. 418 U.S. 323, 384 (1974) (emphasis added).  Significantly, the Court noted that its inquiry would be different "if a State purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential." Id. Applying this standard outside the defamation context, one court found that liability could be imposed on a publisher for advertisements it published only where the plaintiff satisfies a "negligence plus" standard.  See Braun v. Soldier of Fortune Magazine, Inc., 968 F.2d 1110, 1118-1119 (11th Cir. 1992).  In Braun, the court noted that First Amendment precedent allowed for the imposition of liability for the publication of advertisements only where "the ad on its face, and without the need for investigation, makes it apparent that there is a substantial danger of harm to the public." Id.  That is not the case here.  Nasser does not (and cannot) demonstrate that WhitePages' publication of the listings in question involved some obvious danger of harm to the public.   Accordingly, imposition of liability on WhitePages would contravene First Amendment principles.  See also Smith v. Linn, 563 A.2d 123, 125 (Pa. Super. Ct. 1989) (citing to First Amendment principles and declining to impose liability on publisher of "Last Chance Diet" book for injuries sustained by a reader); Brandt v. Weather Channel, Inc., 42 F. Supp. 2d 1344, 1346 (S.D. Fl. 1999) (refusing to recognize a duty to provide accurate weather forecasts because doing so would "chill the well established First Amendment rights of the broadcasters"); Winter, 938 F.2d at 1037 ("Guided by the First Amendment and the values embodied therein, we decline to extend liability under this theory to the ideas and expression contained in a book.").

C. **Section 230 of the Communications Decency Act Bars Nasser's Claims Against WhitePages**

The Communications Decency Act, 47 U.S.C. § 230 ("Section 230"), provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1). Additionally, the statute provides that "[n]o cause of action may be brought and no liability imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).  Section 230 defines the term "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet...."  47 U.S.C. § 230(f)(2).  A defendant is entitled to Section 230 immunity where: (1) the defendant is a provider of an interactive computer service; (2) the information alleged to be harmful was provided by another information content provider; and (3) the plaintiff seeks to treat the defendant as a publisher.  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 564 F. Supp. 2d 544, 548 (E.D. Va. 2008), aff'd, 591 F.3d 250 (4th Cir. 2009).

The Fourth Circuit has also noted that Section 230 "precludes courts from entertaining claims that would place a computer service provider in a publisher's role.  Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions-such as deciding whether to publish, withdraw, postpone or alter content-are barred."  Zeran v. America Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997).  Section 230's immunity applies even where the content is provided by a contractor of the online service provider (*i.e.*, pursuant to a contractual relationship).  See Blumenthal v. Drudge, 992 F. Supp. 44, 51 (D.D.C. 1998) (granting judgment on Section 230 grounds, notwithstanding the payment of monies in exchange for the allegedly offensive content).  Additionally, minor changes to the information made by the

intermediary do not strip the intermediary of Section 230 immunity.  <u>Fair Housing Council of San Fernando Valley v. Roommates.com, LLC</u>, 521 F.3d 1157, 1170 (9th Cir. 2008) (en banc) ("[A]n editor's minor changes to the spelling, grammar, and length of third-party content do not strip him of section 230 immunity."); <u>accord</u> <u>Hare v. Richie</u>, No. ELH-11-3488, 2012 U.S. Dist. LEXIS 122893 (D. Md. Aug. 29, 2012); <u>see also</u> <u>Levitt v. Yelp! Inc.</u>, No. C 10-1321 MHP, 2011 U.S. Dist. LEXIS 99372, at *32-33 (N.D. Cal. Mar. 22, 2011) ("[Defendant] cannot be stripped of Section 230(c)(1) protection solely on the basis of alterations or minor changes to customer reviews, because such conduct is consistent with the traditional editorial functions protected by the CDA.").[1]

 1. <u>WhitePages qualifies for Section 230 immunity.</u>

  *a. WhitePages Provides an Interactive Computer Service.*

 There can be no dispute that WhitePages provides an "interactive computer service." Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. §230(f)(2).

 Courts generally conclude that a website falls within the definition of an "interactive computer service." <u>See</u>, <u>e.g.</u>, <u>Nemet Chevrolet</u>, 591 F.3d at 255 (consumeraffairs.com, a website publishing reviews of businesses and products on it, constitutes an "interactive computer

---

[1] At times, Nasser has speculated that WhitePages purposefully changed the word "Phone" to "Phont," and thereafter published the "Phont" listing.  (<u>See</u>, <u>e.g.</u>, Plaintiff's Objection to and Motion for Reconsideration of The Court's Report and Recommendation filed December 20, 2012 (Dkt. No. 31) at ¶ 36.)  WhitePages denies making any such change, and has provided evidence demonstrating that it received the "Comcast Phont of Virginia" listing from a third-party.  Regardless, the cited cases make clear that such a minor change would not remove WhitePages' Section 230 immunity.

service"); <u>Roommates.com, LLC</u>, 521 F.3d at 1162 n.6 ("Today, the most common interactive computer services are websites."); <u>Universal Commc'ns Sys., Inc. v. Lycos, Inc.</u>, 478 F.3d 413, 419 (1st Cir. 2007) ("[W]eb site operators . . . are providers of interactive computer services" because "[a] web site . . . enables computer access by multiple users to a computer server, namely, the server that hosts the web site." (internal quotation marks omitted)); <u>Batzel v. Smith</u>, 333 F.3d 1018, 1030 n.16 (9th Cir. 2003) (recognizing that several courts have concluded that a website meets the definition of an "interactive computer service").

The WhitePages Websites allow users to, among other things, conduct various types of searches, obtain listings, forward listings to mobile phones, obtain directions to or from addresses found in listings, correct or suggest corrections to listings, create accounts, and save listings to accounts.  (Azose Decl. at ¶¶ 5-6.)  Nasser himself has engaged in some of these activities on multiple occasions.  (Plaintiff's Responses to WhitePages, Inc.'s First Set of Requests for Admissions (attached as Exhibit "B" to the McChesney Decl.), Resp. Nos. 7-10.)  Consequently, WhitePages qualifies as a provider or an "interactive computer service" for purposes of Section 230 analysis.

      *b.*     *The Relevant Listings Were Provided by Third-Parties.*

The evidence establishes that the original association of "Comcast" with Nasser's address and telephone number occurred on March 10, 2009, and was the result of an error by a Verizon employee in processing the listing after Verizon had received the listing from Comcast, Mr. Nasser's telephone company at the time.  (Order Granting in Part Verizon's Plea in Bar (Dkt. No. 11-2), pp. 1-2.)  The evidence further establishes that Verizon thereafter distributed the incorrect listing to a number of telephone directories.  (<u>Id</u>.)  Thus, Verizon was the cause of the original incorrect listing and was responsible for injecting the incorrect listing into the stream of

commerce.

Additionally, the evidence demonstrates that, at least as early as March 2010, WhitePages obtained a listing associating Nasser's address and telephone number with "Comcast, Phone of Virginia" from another third-party data provider. (Azose Decl. at ¶ 16.) Further, the evidence demonstrates that, at least as early as February 2010, WhitePages obtained a listing associating Nasser's address and telephone number with "Comcast Phont of Virginia" from Amacai Information Corp. d/b/a Localeze. (Azose Decl. at ¶ 17.)

While it may be difficult to trace the precise trajectory of the original incorrect listing into the stream of commerce and the identity of all of the parties to whom Verizon supplied the initial incorrect listings, the only relevant determination that need be made for purposes of Section 230 analysis is the determination of whether WhitePages created or participated in the development of the relevant listings. The evidence provided by WhitePages unequivocally indicates that WhitePages does not create any of the listings that it publishes on its websites, and in particular, did not create or participate in the development of the listings at issue in this lawsuit. Nasser points to nothing beyond mere speculation that could lead the Court to determine otherwise. Therefore, WhitePages meets the second requirement for Section 230 immunity.

### c.    *Nasser Seeks to Treat WhitePages as the Publisher of the Listings.*

There also can be no dispute that Mr. Nasser seeks to treat WhitePages as the publisher or speaker of the listings. Each of Mr. Nasser's claims is premised on the publication of the telephone and address listings on WhitePages Websites and the harm to Mr. Nasser that allegedly resulted from such publication. However, even if Nasser were to attempt to recharacterize WhitePages' actions from that of publication to a "failure to remove," such a

recharacterization would not carry the day.  Courts addressing this issue have held that such a recasting of the defendant's actions is a distinction without a difference.  In Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1101 (9th Cir. 2009), the plaintiff sued Yahoo! for failing to remove pictures of her posted, without her consent, by an ex-boyfriend on a Yahoo! website.  570 F.3d at 1098-99.  In considering the plaintiff's negligence claim, the court found that the duty Yahoo! was alleged to have breached plainly derived from its activity as a publisher—it "negligently" failed to de-publish the offending content—and that the CDA provided blanket immunity.  See id. at 1102-03.  The court held that deciding "whether to publish, withdraw, postpone or alter content" is exactly the type of conduct that publishers engage in, and the plaintiff could not circumvent Section 230(c) protections by simply renaming her theory of liability "negligence" instead of "publication."  Id.  A recent case from the Northern District of California, in which the plaintiff sued Google and YouTube after they failed to remove an unflattering video of her despite notifying defendants and requesting removal, is instructive:

> Plaintiffs first argue that publication does not encompass the action challenged here: Google's failure to remove the video even after notice.  Because the factual basis of their cause of action is failure to remove and not publication, Plaintiffs argue, the CDA does not apply and Google nevertheless may be held liable.  But in Barnes v. Yahoo!, Inc., the Ninth Circuit disposed of this very argument. . . . [P]laintiffs here similarly claim that Google owes a duty of care requiring it to remove videos from its website that, by their content, cause foreseeable harm.  But this duty exists only if the court treats Google as a publisher of the content on its websites.  Barnes and the CDA explicitly prohibit imposing liability for such actions.

Gavra v. Google Inc., Case No.: 5:12-CV-06547-PSG, 2013 U.S. Dist. LEXIS 100127, at *5-7 (N.D. Cal. July 17, 2013).  As one court has stated, Section 230 was "a provision enacted to protect websites against the evil of liability for failure to remove offensive content." Roommates.com, LLC, 521 F.3d at 1174.  Thus, regardless of how Nasser characterizes his claims, liability for the alleged failure to remove content is barred by Section 230.

2.      WhitePages did not sell any listings to Yellowbook directories.

Nasser alleges that upon finding a listing for "Comcast Phont of Va." in a 2011-2012 printed directory published by Yellowbook Directories, he called Yellowbook Directories and learned that it had purchased the listing from the DirectoryAssistance.com Site.  (Complaint (Dkt. No. 5-1) at ¶ 30.)    Nasser further alleges that WhitePages owns the DirectoryAssistance.com Site, and therefore the act of selling the listing to Yellowbook Directories strips WhitePages of its Section 230 immunity.  (Id.)

As WhitePages has demonstrated, the DirectoryAssistance.com Site is, and has been at all times relevant to this lawsuit, owned by an individual, Neil Gorin.  (Azose Decl. at ¶ 8; see also historical WHOIS report for directoryassistance.com, attached as Exhibit "A" to the McChesney Decl., demonstrating ownership of the directoryassistance.com site by Neil Gorin since 2001.)  WhitePages has also demonstrated that it entered into an agreement with Mr. Gorin to provide the search and result functionality for the DirectoryAssistance.com Site.  (Azose Decl. at ¶ 8.)  Further, WhitePages has provided evidence demonstrating that Nasser's incorrect belief that WhitePages owned the DirectoryAssistance.com Site was the result of Mr. Gorin placing a copy of the WhitePages TOU on the DirectoryAssistance.com Site, instead of a hyperlink to the WhitePages TOU located on the WhitePages.com Site.  (Id.)  Finally, WhitePages has presented the affidavit of its representative denying that WhitePages ever owned the DirectoryAssistance.com Site, and further denying that WhitePages engages in the sale or other provision of listings to printed telephone directories.  (Id.)

Nasser's mere hearsay speculation to the contrary is insufficient to overcome WhitePages' credible evidence that it never sold any listing to Yellowbook Directories and never owned DirectoryAssistance.com.  Nemet Chevrolet, 591 F.3d at 256 ("The complaint must,

however, plead sufficient facts to allow a court, drawing on 'judicial experience and common sense,' to infer 'more than the mere possibility of misconduct.'")

3.      <u>Nasser cannot make out a claim under Barnes v. Yahoo!.</u>

At least one court has recognized a narrow exception to the rule of Section 230 immunity, where a plaintiff alleges a breach of contract claim under the theory of promissory estoppel.  <u>See, e.g.</u>, <u>Barnes v. Yahoo!, Inc.</u>, 570 F.3d at 1107.  Nasser admits that he does not have any contractual relationship with WhitePages, and he has not brought a claim for promissory estoppel.  (Plaintiff's Responses to WhitePages, Inc.'s First Set of Requests for Admissions (attached as Exhibit "B" to the McChesney Decl.), Resp. Nos. 13-18.)   His three claims are based on theories of nuisance and intentional and negligent infliction of emotional distress.  Accordingly, his claims must be dismissed.

Despite his failure to explicitly plead a promissory estoppel claim, Nasser's Amended Complaint might conceivably be viewed as attempting to plead a promissory estoppel theory in stating that Nasser "relied" on an alleged promise from a WhitePages customer service representative that the listing for Comcast with his address and phone number would be removed.  (Complaint at ¶¶ 10-11, 21.)   However, any claim based upon such a theory necessarily fails because Nasser has not alleged *reasonable* reliance.  Indeed he did not take any action in reliance of his conversation with a WhitePages representative.  Moreover, even assuming that as Nasser alleges, the calls continued, nothing stopped him from contacting WhitePages again, or from utilizing one of the online features WhitePages made available for correcting and/or reporting errors.  Or, as the Circuit Court noted in its Order on Verizon's Plea in Bar, Nasser could have changed his telephone number if he was suffering harm as alleged.  His failure to take any further action is per se unreasonable.

17

In any event, there is a more fundamental problem with asserting a promissory estoppel claim: promissory estoppel is not tenable in this action.  As the Virginia Supreme Court has held, "promissory estoppel is not a cognizable cause of action in Virginia."  Mongold v. Woods, 278 Va. 196, 202 (Va. 2009); see also Cormier v. Atl. Law Group, 2012 U.S. Dist. LEXIS 110885 (E.D. Va. Aug. 7, 2012) ("Virginia has expressly declined to adopt promissory estoppel as a cause of action.").[2]  The Barnes court, in allowing the plaintiff's claims against Yahoo! to survive under a promissory estoppel theory, specifically noted that Oregon had accepted promissory estoppel as a theory of recovery.  Barnes, 570 F.3d at 1106.  In contrast, in this case, the case law clearly provides that such a theory is unavailable.

Therefore, Nasser cannot argue, based on a promissory estoppel theory that his claims fall outside the immunity provided by Section 230.

4.      Section 230 does not impose a duty to monitor or remove listings.

Section 230 does not impose on providers of an "interactive computer service" an obligation to monitor or remove "offensive" materials, as alleged by Nasser.  (See, e.g., Complaint at ¶ 24; Plaintiff's Objection to Report and Recommendation (Dkt. No. 31) at ¶ 42.) Quite to the contrary, Courts have consistently held that no such obligation is created by Section 230.  See Blumenthal, 992 F. Supp. at 52 ("Congress has conferred immunity from tort liability as an incentive to Internet service providers to self-police the Internet for obscenity and other offensive material, *even where the self-policing is unsuccessful or not even attempted*") (emphasis added); Ramey v. Darkside Prods., No. 02-730 (GK), 2004 U.S. Dist. LEXIS 10107, at *18 (D.D.C. May 17, 2004) ("even though Defendant does not engage in 'Good Samaritan'

---

[2] Having chosen to sue in Virginia based on alleged injuries sustained at his residence in Virginia, and having argued extensively based on Virginia law in both this action and the previous action, Nasser cannot credibly make an argument now that the law of another forum should apply for the purposes of promissory estoppel. The substantive law of Virginia is applicable.  See Cunningham v. Delhaize America, Inc., No. 3:12cv00004, 2012 U.S. Dist. LEXIS 140655, at *5 (W.D. Va. September 27, 2012).

18

activities, it still receives full immunity from tort liability under § 230 of the Act"); Donato v. Moldow, 374 N.J. Super. 475, 498 (App. Div. 2005) ("the immunity continues to apply even if the self-policing effort is unsuccessful or not even attempted").  It is immaterial whether or not the interactive computer service provider was notified of the "offensive" material. Zeran, 129 F.3d at 333 (liability upon notice would defeat the dual purposes advanced by § 230 of the CDA"); Black v. Google Inc., No. 10-02381 CW, 2010 U.S. Dist. LEXIS 82905, at *9 (N.D. Cal. Aug. 13, 2010) ("immunity is not vitiated because a defendant fails to take action despite notice of the problematic content"); Doe v. MySpace, Inc., 474 F. Supp. 2d 843, 848 (W.D. Tex. 2007) ("the CDA necessarily protects interactive computer services from liability even after they are notified of an allegedly defamatory or threatening post").

For the foregoing reasons, WhitePages had no duty to monitor, police or remove any listings, even had it been adequately notified of their existence.

5.      Section 230 bars all of Nasser's claims.

As courts have repeatedly held, Section 230's immunity applies broadly to preclude a wide range of claims against providers of interactive computer services based on information that they make available, including the types of claims asserted by Mr. Nasser against WhitePages—i.e., claims for nuisance and emotional distress.  See, e.g., Dart v. Craigslist, 665 F. Supp. 2d 961, 969 (N.D. Ill. 2009) (holding Section 230 bars attempt to hold interactive computer service provider liable based on public nuisance theory for making available erotic services section); Dimeo v. Max, 433 F. Supp. 2d 523, 532 (E.D. Pa. 2006) (refusing to allow amendment of complaint to add intentional infliction of emotional distress claim as claim was barred by § 230(c)); Noah v. AOL Time Warner, Inc., 261 F. Supp. 2d 532, 538 (E.D. Va. 2003) (holding that § 230(c) bars claims for intentional infliction of emotional distress, unjust

19

enrichment, negligence and fraud).

In the face of WhitePages' unequivocal evidence that the listings at issue were sourced from third parties, Nasser can only offer mere speculation that WhitePages created the "Phont" listing, or that it sold listings to Yellowbook directories. This speculation is insufficient to overcome WhitePages' Section 230 immunity. Consequently, Section 230 provides WhitePages with immunity from all of Mr. Nasser's claims, and therefore the claims must be dismissed.

## IV.   CONCLUSION

Nasser's claims fail as a matter of law. WhitePages had no contractual, fiduciary or other relationship with Nasser, and therefore owed no duty to Nasser to publish any listings related to him correctly. Furthermore, Courts have consistently refused to find that publishers owe a duty to the general public. Additionally, holding WhitePages liable for a listing it published that merely contained a "factual misstatement," the substance of which was not obvious or harmful on its face, does not comport with applicable First Amendment principles.

Even assuming that WhitePages somehow has a duty and First Amendment principles allow for the imposition of liability on WhitePages, all of Nasser's claims are barred by Section 230 of the Communications Decency Act. The evidence is clear that WhitePages did not create or participate in the development of any listings involving Nasser and Comcast. Rather, it merely published the listings it received from third-parties. As such, WhitePages is a classic beneficiary of Section 230 and should be immunized from Nasser's claims.

For the foregoing reasons, WhitePages respectfully requests that the Court dismiss the Complaint against WhitePages in its entirety, and with prejudice.

DATED: August 15, 2013

*/s/ Timothy J. Battle*

Timothy J. Battle, Esq. (VSB #18538)

20

524 King Street

Alexandria, Virginia 22314

Tel: (703) 836-1216

Fax: (703) 549-3335

*/s/ Sean M. McChesney*

Sean McChesney (admitted *pro hac vice*)

*/s/Venkat Balasubramani*

Venkat Balasubramani (admitted *pro hac vice*)

Focal PLLC

800 Fifth Avenue, Suite 4100

Seattle, Washington 98104

Tel: (206) 617-3040

Fax: (206) 260-3966

Email: sean@focallaw.com

Email: venkat@focallaw.com

*Counsel for WhitePages, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 15, 2013, the foregoing was served upon plaintiff Michael J. Nasser, Sr. by placing the same in the United States mail, first class postage prepaid, addressed to the following address:

Michael J. Nasser, Sr.
436 Westside Station Drive
Winchester, Virginia 22601

Dated: August 15, 2013

/s/ Sean M. McChesney
Sean M. McChesney

22